# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>MARK A. MARTINEZ d/b/a MARK os SON OF A BRISKET and MELISSA M. MARTINEZ,<br><br>Debtors.<br><br>——————————————<br><br>STATE OF COLORADO, DIVISION OF FINANCE & PROCUREMENT, CENTRAL COLLECTION SERVICES, as Agent for COLORADO DEPARTMENT OF LABOR AND EMPLOYMENT, an Agency of the State of Colorado,<br><br>Plaintiff,<br><br>v.<br><br>MARK A. MARTINEZ,<br><br>Defendant. | Bankruptcy Case No. 18-18665 TBM<br><br>Chapter 7<br><br><br><br>Adv. Pro. No. 19-1012 TBM |

---

## MEMORANDUM OPINION AFTER TRIAL
---

### I.  Introduction.

After the Great Depression, Colorado adopted an unemployment compensation system as a safety net for "persons unemployed through no fault of their own."[1]  Although the system has been modified over the years,[2] the foundation has remained the same. Employers are required to make contributions to an unemployment compensation fund administered by the Colorado Department of Labor and Employment (the "State").[3] Eligible workers who suffer total or partial unemployment may apply for benefits.  The benefits are paid from the unemployment compensation fund.  The *quid pro quo* for

---

[1]    Unemployment Compensation Act, 1939 Colo. Ex. Sess. Laws (3rd Sess.) § 2.

[2]    The current version is the Colorado Employment Security Act, COLO. REV. STAT. § 8-70-101 *et seq.*

[3]    The Plaintiff in this adversary proceeding is the "State of Colorado, Division of Finance and Procurement, Central Collection Services, as agent for the Colorado Department of Labor and Employment."  For purposes of simplicity and ease of reference, the Court uses the term "State" to refer to the Plaintiff.

receiving benefits is that the eligible worker must provide accurate information concerning income and employment.  A claimant who knowingly provides inaccurate income or employment information to receive overpayment of benefits abuses the system.  When the State discovers that it has made an overpayment of benefits, it may seek recovery of the overpayment, along with penalties and collection fees.

In 2016 and 2017, the Defendant-Debtor, Mark A. Martinez (the "Debtor") claimed unemployment benefits.  The State paid unemployment benefits to him based upon the information that the Debtor provided to the State during telephone calls.  However, the State later investigated the Debtor's entitlement to such unemployment benefits and reached the conclusion that the Debtor had lied about his income and employment.  So, the State sought recovery of allegedly overpaid unemployment compensation, as well as penalties, and collection fees from the Debtor.

But, then, the Debtor filed for protection under Chapter 7 of the Bankruptcy Code. He listed the State as a creditor holding an undisputed claim for $10,315.80 based upon an "unemployment overpayment."  The goal of most bankruptcy debtors is a discharge of scheduled debts.  Toward that end, the Debtor sought to discharge his obligation to the State.  However, before the entry of discharge, the State initiated this lawsuit, alleging that its claim for overpaid unemployment compensation, penalties, and collection fees is nondischargeable under both Sections 523(a)(2)(A) and 523(a)(7) of the Bankruptcy Code.[4]  The Debtor conceded that he received overpayments of unemployment compensation and owes a debt to the State, but contested the nondischargeability of such debt.  The dispute proceeded to trial.  Now, the Court must determine whether the State's claim for overpaid unemployment compensation, penalties, and collection fees is nondischargeable under Sections 523(a)(2)(A) or 523(a)(7) such that it will survive the bankruptcy.

## II.      Jurisdiction and Venue.

The Court has subject matter jurisdiction over this adversary proceeding concerning dischargeability pursuant to 28 U.S.C. § 1334.  Furthermore, this is a core proceeding under 28 U.S.C. § 157(b)(2)(I) because it seeks a determination as to the dischargeability of a particular debt.  Both the State and the Debtor consented to the Court's jurisdiction to enter final judgment with respect to the claims and defenses asserted in this Adversary Proceeding.[5]  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

---

[4]      Unless otherwise indicated, all references to "Section" are to Sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

[5]      Docket Nos. 9 and 16.  The Court will use the convention "Docket No. ___" to refer to a document filed in the CM/ECF file for this Adversary Proceeding.  When referring to a document filed in the CM/ECF file for the Debtor's main bankruptcy case, *In re Martinez*, Case No. 18-18665 TBM (Bankr. D. Colo.) (the "Main Case"), the Court will use the convention: "Docket No. ___ in the Main Case").

### III.     Procedural Background.

### A.     The Bankruptcy Case.

The Debtor and his wife filed their joint petition for relief under Chapter 7 of the Bankruptcy Code on October 3, 2018.[6]  They listed the State as a creditor holding an undisputed claim for $10,315.80 based upon an "unemployment overpayment."[7]  On February 21, 2019, the Court issued its "Order of Discharge," generally discharging the Debtors from pre-petition debts.[8]  However, the Order of Discharge excepted from its reach "debts that the bankruptcy court has decided or will decide are not discharged in this bankruptcy case."[9]

### B.     The Adversary Proceeding.

Prior to the entry of the Order of Discharge, the State timely filed its "Complaint to Determine Dischargeability of Debt" (the "Complaint").[10]  In the Complaint, the State asserted that the Debtor is liable to the State in the following amounts relating to alleged overpaid unemployment benefits for the period from January 1, 2017 to May 27, 2017:[11] (1) $6,252.00 for "unemployment compensation"; (2) $4,063.80 for "a 65% monetary penalty"; and (3) $2,578.95 for "a 25% collection fee."[12]  Thus, the State alleged an aggregate debt of $12,894.75.[13]

The State asserted that such debt is nondischargeable under Section 523(a)(2)(A) because the debt is for money "obtained by false pretenses, a false representation, or actual fraud."[14]  More specifically, the State alleged that the Debtor made "representations on the Defendant's weekly claims [that] were false."[15]  Further, the State asserted that the overpaid unemployment benefits debt also is nondischargeable under Section 523(a)(7) "to the extent that such debt is for a penalty payable to or for the benefit of a governmental unit and is not compensation for actual pecuniary loss."[16]  Thereafter,

---

[6]     Docket No. 1 in the Main Case.
[7]     *Id.* at 30.
[8]     Docket No. 22 in the Main Case.
[9]     *Id.* at 2.
[10]    Docket No. 1.
[11]    In the Complaint, the State refers to the relevant time period as: "the weeks *ending* January 7, 2017 through May 27, 2017" Compl. ¶¶ 5 and 11; and "the weeks *from* January 7, 2017 through May 27, 2017" (*Id.* ¶¶ 6 and 10) (emphasis added).  If the time period is for the "weeks *ending* January 7, 2017," it commences on January 1, 2017.  If the time period is for the "weeks *from* January 7, 2017," the time period commences on January 7, 2017.  In the parties' "Stipulation of Facts" (Docket No. 16, the "Stipulation of Facts"), the parties agreed that the relevant time period is from January 1, 2017 through May 27, 2017.  Stipulation of Facts ¶¶ 5, 6 and 8.  Thus, the Court will utilize January 1, 2017 to May 27, 2017 as the relevant time period.
[12]    Compl. ¶¶ 5-11 and 15.
[13]    *Id.* ¶¶ 15 and 18.
[14]    *Id.* ¶ 16.
[15]    *Id.* ¶ 14.
[16]    *Id.* ¶ 17.

the Debtor filed his "Answer to Complaint" (the "Answer"), wherein he generally denied nondischargeability and asserted a series of affirmative defenses.[17]

## C.   The Trial.

Consistent with the Court's "Scheduling Order,"[18] the dispute proceeded toward trial.  Shortly before trial, the State and the Debtor jointly submitted a "Stipulation of Facts."[19]  The Court conducted a trial on the issues framed by the Complaint and Answer on August 27, 2019.[20]  After the presentation of opening statements, the Court received evidence from three witnesses: Patrick Baker; Zao Vo; and the Debtor.  Further, the Court admitted into evidence Exhibit Nos. 1-15 offered by the State.  At the conclusion of the evidence, both the State and the Debtor presented their closing arguments to the Court.  The matter is fully submitted and ripe for decision by the Court as the trier of fact.

## IV.   Findings of Fact.

Based upon the evidence presented at the trial and the Stipulation of Facts, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.

## A.   The Debtor and His Recent Job History.

The Debtor is a 50-year-old resident of Trinidad, Colorado.[21]  In April 2015, he was injured while driving a truck for work.[22]  As a result of the accident, he was unable to work for about a year.[23]  During such period, he received workman's compensation insurance payments because of his on-the-job injury.  Unfortunately, by the time he recovered from his injuries, his employer had gone out of business; so, there was no job to which he could return.[24]  Thus, he was unemployed during most of 2016.  He began to look for other work, but with only middling success.

In or around October 2016, the Primero Reorganized 2 School District (the "School District"), near Trinidad, Colorado, hired the Debtor in a very part-time position as a girls' basketball coach for the fall/winter season.  The Debtor coached at practices and games. His arrangement with the School District provided that he would only be paid at the end of the girls' basketball season during the spring of 2017.  Having successfully completed the athletic season, the School District paid the Debtor a single, lump-sum gross payment of $2,597.94 on March 16, 2017.[25]  After deducting federal and state taxes (which were

---

[17]     Docket No. 6.
[18]     Docket No. 10.
[19]     Docket No. 16.
[20]     Docket No. 19.
[21]     Ex. 8.
[22]     Transcript of Trial 118:13-24, August 27, 2019, Docket No. 21, hereinafter referred to in abbreviated form as "Tr. ____").
[23]     Tr. 118:25-119:2.
[24]     Tr. 119:3-13.
[25]     Ex. 1 at 3.

withheld by the School District), the Debtor netted just $2,057.46 for all his coaching work during the 2016/2017 season.[26]

Since the School District coaching position did not provide regular income and did not pay the Debtor anywhere near enough to pay his family's bills, the Debtor continued to search for other positions.  Some months after receiving the coaching position, in early January 2017, K&S Inc. d/b/a Kelly's Towing and Automotive Repair ("K&S") hired the Debtor as a part-time dispatcher for the company's tow trucks.[27]  The job paid $15.00 per hour gross.[28]  During the first two months of his employment (January and February 2017), the Debtor worked about 20-29 hours per week and earned approximately $300.00 to $435.00 per week gross.[29]  During March, April, and May 2017, the Debtor's role expanded.  He worked about 30 hours each week and earned about $450.00 gross.  After deductions for federal and state taxes and social security, the Debtor netted around $340.00 to $410.00 each week during those months.[30]

## B.    The Debtor's Initial Unemployment Benefits Claim.

As previously discussed, the Debtor was injured at work while driving a truck in April 2015.  When he recovered from his injuries, he was unemployed.  After suffering through many months of unemployment, the Debtor elected to apply for unemployment benefits from the State.  Neither the State nor the Debtor introduced the Debtor's initial unemployment benefits claim into evidence.  However, it appears that the Debtor submitted the application during October 2016, when he was unemployed.[31]  This was just before the School District hired the Debtor for the coaching position.  The State must have approved the application, because it started to pay the Debtor weekly unemployment benefits beginning on October 31, 2016.[32]  Around that time, the State sent the Debtor a "Guide to Unemployment Benefits" explaining the State's unemployment benefits system, including the obligation of claimants to provide accurate employment and income information.[33]

Throughout the balance of November and December 2016, the State paid the Debtor weekly unemployment benefits starting at $108.00 per week and increasing to $568.00 per week.[34]  The State has not alleged that the unemployment benefits payments to the Debtor in 2016 are nondischargeable.  Instead, the focus of the Complaint is only on unemployment benefits payments made between January 1, 2017 and May 27, 2017.

---

[26]    *Id.*
[27]    Ex. 2.
[28]    *Id.*
[29]    *Id.*
[30]    *Id.*
[31]    Exs. 7 and 8.
[32]    Ex. 5 at 1.
[33]    Ex. 12, the "Guide."
[34]    Ex. 5 at 1.

C.      **The 2017 Unemployment Benefits Claims and Payments.**

    1.      **The "CUBLine" Telephone System.**

        Under the State's unemployment benefits system, after a claimant's initial application for unemployment benefits is approved, the claimant "must request payment every two weeks and meet all eligibility requirements."[35]  The State offers two main means for claimants to request bi-monthly payments: (1) online through the State's internet website; and (2) by telephone through the State's telephone system.[36]  Although the Debtor made his initial application for unemployment benefits online through the State's internet website during October 2016, he elected to make all subsequent bi-monthly claims for unemployment benefits by telephone.[37]

        The State's telephone system for unemployment benefits is the CUBLine system ("CUBLine").  According to the Guide, a claimant located outside the Denver metropolitan area must call a dedicated telephone line.  CUBLine is completely automated.  Put another way, the claimant must communicate with a "machine" rather than a person.  CUBLine follows a sort of patterned interaction.  If a worker wants to make a bi-monthly request for unemployment benefits pertaining to an initial claim that had already been approved, then such claimant must persevere through some automated messages and a series of prompts.

        The State introduced into evidence a "script" for typical CUBLine calls.[38]  However, notably, the State failed to provide recordings of any actual calls with the Debtor.  During closing argument, counsel for the State candidly acknowledged that "there are no recordings of the CUBLine phone calls, which is why they were not provided."[39]  The Court does not know why the State decided not to record all calls requesting unemployment benefits.  But, regardless of the reason, the State's failure to record any CUBLine calls has created unnecessary evidentiary uncertainty and complexity.

        In any event, according to the generic CUBLine script, a typical call starts with the following automated message:

> You're about to request payment for a two week period . . . I'll ask you some questions to find out if you met the requirements to receive payment for the weeks ending _____ and _____.  I'll ask the questions for each week separately.  Please wait for verification that your request for payment has been accepted at the end of this call; otherwise, your answers won't be saved.  Make sure to report all hours you worked, all money you earned, and if you stopped working at any job during each week you request

---

[35]    Ex. 12 at 8; *see also* Tr. 13:2-5.
[36]    Tr. 19:9-12.
[37]    Tr. 19:13-15; Tr. 45:21-24.
[38]    Ex. 13.
[39]    Tr. 151:5-7.

> benefit payments.  Not reporting your hours and earnings
> could be considered fraud and could cause you to be
> overpaid.  If that happens, you will have to pay back benefits
> already received and any additional penalties that may apply.
> If you have questions about reporting hours and earning,
> please call customer service . . . .[40]

After the foregoing, the CUBLine system asks a claimant to confirm that such claimant is engaged in an active job search and has both the ability and availability to work.[41]  The CUBLine script introduced by the State suggests that a claimant must press a telephone key to respond "yes" or "no" to the foregoing inquiries.[42]  And, one of the State's witnesses testified that the CUBLine system required telephone key entries.[43]  The Debtor denied any requirement to press telephone keys and instead insisted that he only "talk[ed] to the computer" or "talk[ed] to the thing."[44]  On direct examination, the Debtor testified:

> Q.    When you call the CUBLine is it — you're verbally
> talking, is that correct?
>
> A.    Yes.
>
> Q.    So you're having a conversation with a computer?
>
> A.    Yes.
>
> Q.    Do you think there's a recording of that conversation
> out there somewhere?
>
> A.    I would hope so.[45]

On cross-examination, the Debtor further testified about the CUBLine mechanics as follows:

> [Y]ou don't enter [a number] — it's not a push a button thing.
> It's all verbal.[46]

Counsel for the State appeared to accept or concede the point when she responded: "Right, understood."[47]

---

40    Ex. 13 at 1.
41    *Id.* at 1-2.
42    Ex. 13.
43    Tr. 38:13-41:17.
44    Tr. 126:7-12.
45    Tr. 128:8-15.
46    Tr. 135:21-22.
47    Tr. 135:23.

One of the State's witnesses, Patrick Baker, a Labor and Employment Specialist II for the State, seemed to acknowledge that the CUBLine system accepts verbal responses. In characterizing CUBLine system interaction, he repeatedly referred to claimant communication in the following terms: "If they say yes . . . ."; "If they say no . . . ."; "If you say yes . . . ."; "If you say no . . . ."[48]  However, there is some confusion because the same witness also stated multiple times that the CUBLine system utilizes telephone key entries. Another of the State's witnesses, Zao Vo, also a Labor and Employment Specialist II for the State, characterized the circumstances as the Debtor "repeatedly saying no" to one of the questions.[49]  But, then she also referred to "key pad" entries.[50]  Based upon the foregoing, and hampered by the State's failure to produce any recordings of the telephone calls, the Court finds that all of the Debtor's interaction with the CUBLine telephone system was verbal.[51]  This is consistent with the Regulations Concerning Employment Security promulgated by the Colorado Department of Labor and Employment which characterize the CUBLine system as "the division's interactive voice response system."  7 COLO. CODE. REG. 1101-2.1.7.1.

In any event, after the various advisements and preliminary questions, the CUBLine machine gets to the main point and asks a threshold question:

> During this week, did you work at all or receive holiday pay?[52]

The Court refers to this question as the "Did You Work Question."  The State introduced no definitive evidence as to how the Debtor responded to the "Did You Work Question" during any of his calls with the CUBLine system.  However, if a claimant responds "no" to the "Did You Work Question," then the CUBLine system questioning is mostly at an end, except for a verification stage during which CUBLine asks a claimant to verify previous answers.[53]  On the other hand, if a worker answers "yes" to the "Did You Work Question," then the CUBLine system channels such claimant to a series of other questions designed to obtain additional information.[54]  Under such circumstances, a claimant "must report [his] total earnings" as well as "the number of hours . . . worked."[55]  The Court refers to these questions as the "Earnings and Hours Questions."  And, then, after the "Earnings and Hours Questions," the CUBLine machine asks a claimant to verify such answers.[56]

The Court accepts that the foregoing summary of the script identifies the generic CUBLine telephone system process.  However, to reiterate, the State did not introduce into evidence recordings of any actual calls with the Debtor.

---

[48]     Tr. 39:2-40:24 (using reference to verbal expression 11 times during testimony).
[49]     Tr. 87:13-15.
[50]     Tr. 98:14.
[51]     Notwithstanding some confusion in the evidence, ultimately, the difference between verbal responses and telephone press-button responses does not appear particularly material or legally significant.
[52]     Ex. 13 at 2; *see also* Tr. 43:20-23; Tr. 44:10-13.
[53]     Ex. 13.
[54]     *Id.*
[55]     *Id.*
[56]     *Id.*

## 2.    The State's Evidence Concerning the Debtor's CUBLine Calls.

The State proved that the Debtor called the CUBLine system ten times during the relevant period to make bi-monthly claims for unemployment benefits.[57]  Since the State does not record unemployment benefits calls, the Debtor did not speak to a real person, and the CUBLine system is a "machine" that cannot testify in court, the State's evidence of what actually happened during the Debtor's calls to the CUBLine system is limited. According to one of the State's witnesses, Patrick Baker, the CUBLine "phone system []  translates the information that they [claimants] put into the system."[58]  This "happens behind the scenes."[59]  The Court received no evidence concerning exactly how the Debtor's verbal answers were "translated."  Again, there are no recordings of any calls to the CUBLine system; and there are not any written "translations."

Instead, what the State relies on is a computer "screen-shot" of a "Payment History" for the Debtor.[60]  According to Patrick Baker, the column titled "Original Earnings" on the "Payment History" "will show what was originally reported by the claimant" for weekly earnings.[61]  And, the column titled "Hours" is supposed to record what the claimant stated for weekly hours worked.[62]  For the period from January 1, 2017 to May 27, 2017, the "Original Earnings" and the "Hours" columns on the Debtor's "Payment History" are completely blank — it is just some empty white space.[63]  The State seems to assert that the blank space means that the Debtor reported (during ten separate calls) that he had no income or hours.  Later the State created an "Earnings Summary" for the Debtor.[64]  On the "Earnings Summary," the State wrote down that the Debtor had reported "$0.00" "Gross Earnings" and "0" "Hours" for each week from January 1, 2017 to May 27, 2017.  To create the "Earnings Summary," the State just relied on the blank spaces from the "Payment History."[65]

But, exactly what the Debtor stated during the ten calls remains somewhat of a mystery based upon the State's evidence.  For example, returning to the CUBLine script, perhaps the Debtor responded to the "Did You Work Question" by stating "no."  On the other hand, maybe, the Debtor stated "yes" to the "Did You Work Question" and then was channeled to the follow-up "Earnings and Hours Questions."  Perhaps the Debtor answered the follow-up questions by reporting "$0.00" income earned and "0" hours worked.  The implication from the "Earnings Summary" created by the State is that the Debtor somehow got channeled to the "Earnings and Hours Questions" and then he stated "$0.00 and "0" for "Gross Earnings/Hours Reported by You."[66]

---

[57]     Exhibits 3 and 5 show that the Debtor called the CUBLine system on January 9, January 22, February 5, February 19, March 5, March 19, April 2, April 16, April 30, and May 14, 2017.
[58]     Tr. 16:6-7.
[59]     Tr. 62:20.
[60]     Ex. 3.
[61]     Tr. 15:24-16:1; Tr. 16:12-18.
[62]     Id.
[63]     Ex. 3.
[64]     Ex. 4 at 2.
[65]     Tr. 17:19-18:11.
[66]     Ex. 4.

In the end, the State's evidence is unclear and equivocal. All that is certain is that someway and somehow the relevant earnings and hours columns on the Debtor's "Payment History" are blank.

### 3. The Debtor's Testimony Concerning the Debtor's CUBLine Calls.

The Debtor provided a different story concerning his interaction with the CUBLine system. He claimed repeatedly that he was "confused by the CUBLine."[67] Although his testimony was not a model of clarity, it appears that the Debtor initially had questions about how to report his work for the School District in 2016 since he did not anticipate receiving any income until the end of the girls' basketball season. The Debtor asserts that he contacted the State by telephone. Apparently, the Debtor was referred to various personnel at the State and finally was advised by someone that he should "enter zeros for [School District] coaching in 2016 . . . ."[68] The Debtor did not recall the full name of the person he allegedly spoke with and had no records of the call. Further, the State has no record of any such call.[69] However, the Debtor claims that during October, November, and December 2016, he followed the advice and "entered zeros" for School District income and hours.[70] In other words, he answered the "Did You Work Question" with a "yes" and then reported zeros for the "Income and Hours Questions."[71] From the Debtor's perspective, although he was working, his answers were initially truthful because he was not paid anything by the School District in 2016.

According to the Debtor, the situation became more convoluted and confusing in 2017 when the Debtor took a second job with K&S. The Debtor testified that he "attempted to report" the K&S hours and income along with his unpaid work for the School District through the CUBLine system.[72] However, he states that the "CUBLine system wouldn't take it."[73] The Debtor testified that he was "stuck in a loop."[74] So, the Debtor asserts that he called the State customer service line three times to obtain help.[75] He does not remember the full name of the person to whom he was eventually referred. He has no record of any such calls.[76] Further, the State has no record either.[77] But, the Debtor states that he was advised to enter the K&S income and hours first and then enter the School District data as "zeros" (because he still had not been paid by the School District).[78] The Debtor claims that he followed the guidance.[79]

---

[67]     Tr. 113:25-114:1.
[68]     Tr. 132:13-15; Tr. 108:10-109:4.
[69]     Tr. 45:19-20; Tr. 88:14-18.
[70]     Tr. 121:10-14.
[71]     Tr. 136:10-13.
[72]     Tr. 107:13.
[73]     Tr. 107:14.
[74]     Tr. 124:18-22.
[75]     Tr. 107:21-23; Tr. 124:18-125:22.
[76]     Tr. 108:4-6.
[77]     Tr. 45:19-20; Tr. 88:14-18.
[78]     Tr. 124:18-125:19; Tr. 136:10-13.
[79]     Tr. 122:21-123:8; Tr. 125:8-19; Tr. 135:23-136:16.

The Debtor asserted repeatedly that he properly reported, or at least thought that he had properly reported, his income and hours through the CUBLine system all along consistent with the guidance he received from the State.[80]  For example, on cross examination he testified as follows:

> Q.      So, it is your testimony today that you did enter [in the CUBLine system] your hours worked and wages earned from January 7, 2017 through May 27, 2017?
>
> A.      Yes.[81]

The Debtor claims that he honestly and truthfully disclosed all his earnings and, thus, never made any false statements.[82]

The Court assesses the Debtor's credibility as suspect.  First, he repeatedly seemed to contradict himself throughout the prosecution of the Adversary Proceeding. For example, the Debtor's responses to the State's written interrogatories contradict his story at trial.  The Debtor responded to numerous interrogatories with the rote statement: "Defendant was unable to successfully navigate the phone system required to submit weekly claims and complete the process."[83]  This response simply cannot be squared with the Debtor's testimony that he did figure out how to work the CUBLine system and provided all his income and hours on a bi-weekly basis from January 1, 2017 to May 27, 2017.[84]  Second, even though there was no evidence concerning CUBLine system error rates, the Court doubts that the CUBLine system improperly "translated" the Debtor's income and hours statements during all ten calls made by the Debtor to the CUBLine system.  That would mean that the CUBLine system had a 100% error rate.  Third, the Debtor seemed to indicate that he always put in "zeros" for income and hours for the School District coaching job.  But, it is uncontested that the Debtor received $2,597.94 gross on March 16, 2017 for that job.  The Debtor never expressly stated that he disclosed such income.  Fourth, the CUBLine system script contains a verification stage after a claimant enters income and hours information.  The Debtor never satisfactorily explained how he was able to complete the verification stage, which should have flagged any discrepancies between what the Debtor thought he reported and what the CUBLine system "translated."

### 4.    __The Payments to the Debtor__.

In any event, relying on the information from the "Payment History," the State paid the Debtor $568.00 in unemployment benefits for each week from January 1, 2017 to May

---

[80]    Tr. 107:9-11; Tr. 115:4-7; Tr. 122:23-123:8; Tr. 126:3-12; Tr. 132:17-22.
[81]    Tr. 135:7-10; *see also* Tr. 132:17-22; Tr. 134:13-16.
[82]    Tr. 133:3-15.
[83]    Ex. 15.
[84]    Tr. 109:8-111:18.

11

27, 2017.[85]  The Court finds that there were 11 payments to the Debtor totaling $11,928.00 during such time.[86]  During the period from January 1, 2017 to May 27, 2017, when the Debtor was receiving unemployment benefits, he was coaching for the School District (but not being paid regularly).  Also, during such period, the Debtor was working part-time for K&S and receiving weekly compensation.

## D.    The State's Investigation.

From January 1, 2017 to May 27, 2017, the State relied on the "Payment History" generated by the CUBLine system to determine that the Debtor was not working and not making any income.  Thus, the State paid the Debtor unemployment benefits.  However, the State has "a system that routinely checks to see if someone is working . . . ."[87]  The cross-check system generated a red flag sometime in the summer of 2017 — presumably based upon reporting from the School District and K&S.[88]  Thus, the State initiated an investigation of the Debtor.

As a result, on August 17, 2017, the State sent a "Request to Employer for Earnings Data Audit" to K&S, requesting that K&S provide information concerning the total hours worked by the Debtor, as well as gross wages earned by the Debtor from March 26, 2017 to June 24, 2017.[89]  K&S responded and provided its payroll records for the expanded period from January 1, 2017 to August 23, 2017.[90]

Similarly, on September 21, 2017, the State sent a "Request to Employer for Earnings Data Audit" to the School District requesting that the School District provide information concerning the total hours worked by the Debtor as well as gross wages earned by the Debtor for the period from April 9, 2017 to June 24, 2017.[91]  The School District did not provide any details concerning hours worked by the Debtor but confirmed that he received gross pay of $2,597.94 on March 16, 2017.[92]

## E.    The Administrative Process and Calculation of Debt.

Based upon the payroll data received from the School District and K&S, the State prepared the "Earnings Summary" identifying the earnings data received from both employers from January 1, 2017 to May 28, 2017.[93]  With respect to the School District, even though the Debtor received only a single lump-sum payment on March 16, 2017, the State applied such payment retrospectively and calculated that the Debtor had earned

---

[85]     Ex. 4; Ex. 5.
[86]     *Id.*
[87]     Tr. 13:9-17.
[88]     Tr. 81:12-15 ("his claim was randomly selected for a cross match audit because we have wages reported in the system").
[89]     Ex. 2.
[90]     *Id.*
[91]     Ex. 1.
[92]     *Id.*
[93]     Ex. 4 at 2.

income of $144.33 per week from January 1, 2017 to March 18, 2017.[94]   The weekly income calculation was based on prorating the Debtor's single lump sum payment over the 18-week duration of the girls' basketball season.[95]   The K&S records were somewhat more straightforward.  Even though the employer's records were not broken down on a week-by-week basis, the State calculated that K&S paid the Debtor somewhere between $255.48 to $416.35 per week (depending on the varying number of hours the Debtor worked).[96]

Bottom line: in the Earnings Summary, the State concluded that the Debtor had earned an aggregate of $9,221.81 from both K&S and the School District from January 1, 2017 to May 27, 2017.[97]   Meanwhile, the State had paid the Debtor unemployment benefits of $11,928.00 during the same time period.[98]

On October 23, 2017, the State mailed the Debtor (at his residential address) a "Claimant Inquiry and Earnings Data Request" (the "Inquiry") advising the Debtor that "[a]n audit of your unemployment insurance claim shows you may have received benefits to which you were not entitled."[99]   The State provided the "Earnings Summary" prepared by the State based upon data received from the Debtor's employers and showing the State's calculations of "Earnings" and "Benefits Paid."  Through the Inquiry, the State requested that the Debtor respond within one week with additional information and corrections regarding the "discrepancies in wages reported by your employer(s) and the amounts reported by you . . . ."[100]   The State warned that if the Debtor did not respond "a determination will be made [by the State] upon the available information."[101]

The Debtor did not respond to the Inquiry.  So, the State used the data from the Earnings Summary and made a calculation of alleged unemployment benefits overpayments.[102]   Although the State did not explain the precise methodology for its calculation, the State's computer apparently decided that the Debtor had received an overpayment of $6,252.00.[103]   Such amount was about half of the unemployment benefits that the Debtor had received ($11,928.00) during the review period.  So, the State was not asking for a return of all unemployment benefits paid.  Furthermore, the State's

---

[94]   *Id.*
[95]   Tr. 81:25-83:8; Tr. 93:17-21.
[96]   Ex. 4.
[97]   *Id.*  In Stipulated Fact No. 6, the parties stipulated that the Debtor received $10,705.12 on a combined basis from K&S and the School District for the weeks ending January 7, 2017 to May 27, 2017. However, Exhibit 4 unequivocally shows that the Parties inadvertently included $1,483.31 for later time periods in the calculation.  Thus, the correct total payment amount for the period from January 1, 2017 to May 27, 2017 is $9,221.81.  The difference is not material.
[98]   *Id.*  In Stipulated Fact No. 5, the parties stipulated that the Debtor received "unemployment insurance benefits in the total amount of $12,160.00 for the weeks ending January 7, 2017 to May 27, 2017."  However, Exhibit 4 unequivocally shows that the Parties inadvertently included $232.00 for the week from May 28, 2017 to June 3, 2017 in the calculation.  Thus, the correct total payment amount for the period from January 1, 2017 to May 27, 2017 is $11,928.00.  The difference is not material.
[99]   Ex. 4 at 1.
[100]   *Id.*
[101]   *Id.*
[102]   Ex. 7.
[103]   *Id.*

computer calculated a 65% penalty equal to $4,063.00.[104]  Adding the alleged overpaid unemployment benefits and the penalty together, the State calculated that the Debtor owed the State $10,315.80.

True to its warning in the Inquiry, on November 6, 2017, the State issued a "Determination of Overpayment of Benefits and Demand for Repayment" (the "Determination") and mailed it to the Debtor (at his residential address).[105]  As set forth in the Determination, the State advised: "It has been determined that you received benefits to which you were not entitled."[106]  The State specifically identified $6,252.00 of "Benefits Overpaid" plus a "Monetary Penalty" of $4,063.80, thus yielding a "Total Amount Due" of $10,315.80.[107]  The Determination asserted that the Debtor had made 25 "weekly claims filed due to misrepresentation or false statements."[108]  The State asked the Debtor to promptly pay $10,315.80.  Further, the State advised the Debtor of his administrative appeal rights and noted that any "appeal must be received within 20 calendar days after the . . . date mailed [*i.e.*, by November 26, 2017]."[109]  The Determination contained another copy of the Earnings Summary previously sent to the Debtor along with a further "Explanation of Appeal Rights for a Claimant or Employer" explaining the State's procedures for late appeals.[110]

The Debtor did not respond to the Determination or appeal by the November 26, 2017 deadline.[111]  Accordingly, having received no reply, on June 1, 2018, the State mailed the Debtor (at his residential address) a "Request for Balance of Overpayment" (the "Request"), again requesting that the Debtor pay an "Amount Due" of $10,315.80 and warning that the failure to pay would result in the transfer of the Debtor's account for collection.[112]

The next day (June 2, 2018), the Debtor responded for the first time to the Determination.[113]  He submitted a very late appeal (the "Late Appeal").  In the Late Appeal, the Debtor advised that "[t]here was a mixup in address 1045 Smith Trinidad Colo 81082".[114]  With respect to the reason for the lateness of the appeal, the Debtor stated: "Attached is a picture of address confusion and why I was not receiving all of my mail. Please take that into consideration of delay for disagreement."[115]  However, the Debtor

---

[104]   *Id.*
[105]   Ex. 6.
[106]   *Id.* at 1.
[107]   *Id.*
[108]   *Id.*
[109]   *Id.* at 2.
[110]   *Id.* at 4.
[111]   Tr. 20:24-21:1; and Tr. 23:9-10.
[112]   Ex. 9.
[113]   Ex. 10.
[114]   *Id.*  Whether or not there was a "mixup in address" when the State sent mailings to the Debtor may explain why the Debtor was late in responding; however, the issue has no real bearing on the nondischargeability issues in dispute in this adversary proceeding.  So, the Court need not make any factual findings concerning the Debtor's receipt of mail but notes that all of the mailings were addressed to the Debtor at the address that he himself provided.
[115]   *Id.* at 2-3.

14

did not attach any "picture of address confusion."[116]  In the balance of the appeal the Debtor stated:

> When I started employment at the beginning of the year of 2017 with Kelly's Towing I . . . called the Department of Labor and Employment after numerous attempts to input my earnings on the automated line.  I spoke with a Male Representative I believe his name was Steve.  And I verbally reported employment to him (Steve) explained my concerns and was advised nothing more needed to be done due to part time and pay did not meet requirements to close the claim. And it would be considered supplemental pay.  I am not denying I received (payments) claim benefits while employed, I am not opposed to repayment of overpayment benefits minus supplement, and ask with all due repect [sic] the mandatory penalty be deferred or waved [sic].[117]

The State subsequently dismissed the Late Appeal.[118]  So the State's Determination is final.

The key part of the exchange is that the Debtor essentially confessed that he received unemployment benefits overpayments.  In other words, the Debtor does not deny the amount of the debt owed to the State: $10,315.80.  The Debtor even identified such amount as an undisputed claim on his bankruptcy schedules.  Accordingly, the Court finds that the State overpaid the Debtor $6,252.00 in unemployment benefits and that the State imposed a 65% penalty equal to $4,063.00.

## V.    Burden of Proof.

The State bears the burden of establishing nondischargeability under Section 523(a) by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) ("Requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests."); *Houston v. Munoz (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015) (requiring creditor to prove Section 523 claims by a preponderance of the evidence).

## VI.    Legal Conclusions.

In the Complaint, the State asserted that the Debtor is liable to the State for overpaid unemployment compensation for the period from January 1, 2017 to May 27, 2017 in the amount of:  (1) $6,252.00 for "unemployment compensation"; (2) $4,063.80 for "a 65% monetary penalty"; and (3) $2,578.95 for "a 25% collection fee."[119]  Thus, the

---

[116]    *Id.*
[117]    *Id.* at 2.
[118]    Ex. 11.
[119]    Compl. ¶¶ 5-11 and 16.

State alleged an aggregate debt of $12,894.75 (the "Debt").[120]  The Debtor has not contested the dollar amount of the Debt and has not contested that he owes such amount to the State.  Accordingly, the only legal issue is this adversary proceeding is whether the Debt, or any portion of the Debt, is nondischargeable under the Bankruptcy Code.

The State asserts that the Debt is nondischargeable under Section 523(a)(2)(A) because the debt is for money "obtained by false pretenses, a false representation, or actual fraud."[121]  More specifically, the State alleged that the Debtor made "representations on the Defendant's weekly claims [that] were false."[122]  Further, the State asserted that the Debt also is nondischargeable under Section 523(a)(7) "to the extent that such debt is for a penalty payable to or for the benefit of a governmental unit and is not compensation for actual pecuniary loss."[123]

## A.   The Plaintiff Failed to Establish a Section 523(a)(2)(A) Claim.

The State bases its first claim on Section 523(a)(2)(A), which provides:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt — . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by — (A) *false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition* . . . .

11 U.S.C. § 523(a)(2)(A) (emphasis added).

In support of its Section 523(a)(2)(A) claim, the State contends that the Debtor's "representations" in the "weekly claims" on the CUBLine calls "were false."[124]  According to the State, the Debtor lied to the State (on all ten calls to the CUBLine system).  The State alleges that the Debtor "reported" no "hours worked" and no "earnings" on the CUBLine telephone calls even though the Debtor was employed by both the School District and K&S and earned income from both entities during the January 1, 2017 to May 27, 2017 time period.

## 1.   The Alleged Misrepresentations Are Not Actionable Under Section 523(a)(2)(A) Because They Are Statements Respecting the Debtor's Financial Condition.

As set forth below, the Court determines that the State has not met its burden to establish a viable claim under Section 523(a)(2)(A).  Part of the problem is the nature and quality of the State's evidence.  The State is unable to prove what the Debtor did or did

---

[120]   *Id.* ¶¶ 15 and 18.
[121]   *Id.* ¶ 16.
[122]   *Id.* ¶ 14.
[123]   *Id.* ¶ 17.
[124]   *Id.* ¶ 14.

not represent during each of the ten telephone calls that the Debtor placed to the CUBLine system.  The State did not record any of the telephone calls and has no transcripts of the content of such communications.  Further, no State employees participated in the telephone calls.  That is because the CUBLine system is fully automated.  So, the Debtor was talking only "to the computer."  And, the computer is not a witness capable and competent to testify at trial.  So, the Court is left only with the data the CUBLine system somehow transposed to the blank space on the "Payment History," which indicates that the Debtor reported no income and no hours worked from January 1, 2017 to May 27, 2017.  In the circumstances of this case, the Court is reticent to rely on such inconclusive evidence alone.

However, even if the State is entirely correct that the Debtor falsely reported his income and hours worked, the State still cannot prevail under Section 523(a)(2)(A).  Oral statements about the Debtor's income and hours, even if false, are not actionable under Section 523(a)(2)(A), because such statements are statements "respecting the debtor's . . . financial condition."  Statements "respecting the debtor's . . . financial condition" can be pursued only if in writing and only if brought under a separate statute not pled by the State: Section 523(a)(2)(B).

The United States Supreme Court's recent unanimous decision,[125] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018), is dispositive in this Adversary Proceeding.  Writing "for the Court," Justice Sotomayor started by succinctly identifying the Section 523(a)(2)(A) issue:  "This case is about what constitutes a 'statement respecting the debtor's financial condition.'"  *Id.* at 1757.  In *Lamar*, the debtor falsely told his law firm creditor that "he was expecting a tax refund of 'approximately' $100,000" and that "he had not yet received the refund."  *Id.*  In reality, the debtor in *Lamar* was a scallywag: he received a tax refund of far less than $100,000 and then he spent it on his own business without paying the law firm.  Thus, it was undisputed that the debtor in the *Lamar* case lied during his conversations with the creditor.

Parsing the Section 523(a)(2)(A) statutory language, the Supreme Court analyzed the "ordinary meaning" of the words: "statement"; "financial condition"; and "respecting." *Id.* at 1759.  The appellate court determined that "a statement" is "the act or process of stating, reciting, or presenting orally or on paper; something stated as a report or narrative; a single declaration or remark."  *Id.* at 1759 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2229 (1976)).  And "financial condition" means "one's overall financial status."  *Id.*  But the real linchpin to the statutory exercise is the word "respecting."  According to the Supreme Court, the term "respecting" means "in view of; considering; with regard or relation to; regarding; concerning."  *Id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1934 (1976)).  The word "respecting" must be read "expansively."  *Id.* at 1760.

---

[125]     The *Lamar* decision is unanimous in the sense that all Justices of the Supreme Court concurred in the result that "a statement about a single asset can be 'a statement respecting the debtor's financial condition'" and thus is not actionable under Section 523(a)(2)(A).  However, three Justices declined to join in a portion of the majority decision (Part III.B.).

Justice Sotomayor put the terms and phrases together and held that even "a statement about a single asset" (*i.e.,* the expected tax refund) "can be a statement respecting the debtor's financial condition." *Id.* at 1761. Ultimately, the Supreme Court determined that the false oral statement about the debtor's tax refund was a "statement respecting the debtor's financial condition" and so not actionable under Section 523(a)(2)(A). In reaching that holding, the Supreme Court observed that "the text of Section 523(a)(2) plainly heightens the bar to discharge when the fraud at issue was effectuated via a 'statement respecting the debtor's financial condition.'" *Id.* at 1763.[126] Such statements are only actionable if in writing and according to Section 523(a)(2)(B) — not Section 523(a)(2)(A). *See Am. Nat'l Bank v. Dalcourt (In re Dalcourt)*, 354 B.R. 868, 874 (Bankr. N.D. Iowa 2006) ("subsections 523(a)(2)(A) and (B) are mutually exclusive").

Applying *Lamar* to this Adversary Proceeding, the focus must be on the nature of the alleged false statements. The State alleges that the Debtor made ten calls to the CUBLine system during which he told the computer that he had no income and worked no hours. The multiple representations that the Debtor had no income and no hours clearly are "statements" within the scope of Section 523(a)(2)(A) and *Lamar*. So, then the key question is whether such statements are "respecting the debtor's . . . financial condition."

The Court determines that oral reports about earnings and hours worked are statements respecting the Debtor's financial condition. The proposition is virtually self-evident. In the context of bankruptcy, most consumer debtors (like the Debtor in this Adversary Proceeding) lack significant assets. So, employment and income often are the most important aspects of a debtor's financial condition. In terms of "plain" or "ordinary" meaning, when most people consider a debtor's "financial condition," the first thing that comes to mind is employment and income. Does the person have a job and how much does that person make? "Inherently, income is a critical aspect of a debtor's financial condition." *MBNA Consumer Servs., Inc. v. Jackson (In re Jackson)*, 252 B.R. 877, 878 (Bankr. W.D.N.Y. 2000) (rejecting Section 523(a)(2)(A) claim because misrepresentation concerning income was made orally). Asking the question in reverse proves the point. Do statements about income and employment have nothing to do with a person's financial condition? Of course not.

A series of bankruptcy statutes, rules, and forms reinforces the importance of employment and income for analysis of financial condition. For example, to qualify for bankruptcy under Chapter 13, a debtor must have "regular income." 11 U.S.C. § 109(e). To obtain a fee waiver for bankruptcy under Chapter 7, a debtor must disclose the "person's average monthly income (take home pay)." Official Form 103B. At the very beginning of every individual bankruptcy case, a debtor must file a Statement of Financial Affairs and Schedules. 11 U.S.C. § 521(a); Fed. R. Bankr. P. 1007(b). Part 2 of the Statement of Financial Affairs requires a debtor to disclose "any income from employment." Official Form 107. Use of the term "financial affairs" in the Statement of Financial Affairs seems quite analogous to the phrase "financial condition." Schedule I mandates that a debtor disclose "employment status," the "employer's name," and

---

[126] This holding is contained in Part III.B of the *Lamar* decision. Three Justices did not join that section of the opinion.

"monthly gross wages, salary, and commissions."  Official Form 106I.  And, a debtor must also provide copies of "all payment advices [*i.e.,* pay stubs] . . . received within 60 days before [the petition date]."  11 U.S.C. § 521(a)(1)(B)(iv).  The Chapter 7 "means test calculation" (which may dictate whether a debtor should be in Chapter 7 liquidation or Chapter 13 reorganization) starts with identification of a debtor's "gross wages, salary, tips, bonuses, overtime, and commissions."  Official Form 122A-1.  In Chapter 13, the entire reorganization process is based upon the commitment of "future earnings." 11 U.S.C. § 1322(a)(1).  The concept of "disposable income," which includes "gross wages, salary, tips, bonuses, overtime, and commissions," is central in contested Chapter 13 confirmation proceedings.  11 U.S.C. § 1325(b); Official Form 122C-2.  So, it is fair to say, employment and income are central to the evaluation of a debtor's financial condition in the bankruptcy process.

Not surprisingly, most reported judicial decisions that have directly considered whether statements (either orally or in writing) about a debtor's employment and income are statements "respecting a debtor's . . . financial condition" within the meaning of Section 523(a)(2)(A) have reached the conclusion that they are.  For example, one such decision, *Iowa Dep't of Human Servs. v. Brown (In re Brown)*, 1992 WL 12626473, at *2 (Bankr. S.D. Iowa Jan. 8, 1992), is right on point.  That case, like this Adversary Proceeding, involved government benefits.  The debtor filed an application with the Iowa Department of Human Services asking for aid.  In the application, the debtor stated that "she was not employed and derived no income from employment."  The statements about employment and income were very similar to the statements the Debtor allegedly made in this case.  In *Brown*, the court held:

> [A] statement regarding a debtor's employment and level of income is a statement respecting a debtor's financial condition.  [W]here eligibility for a need-based governmental program was dependent upon an individual's earnings, a statement regarding the defendant's employment status and level of income was clearly a statement respecting her financial condition.

*Id.* at *2.  Thus, the *Brown* court rejected the nondischargeability claim for overpaid unemployment benefits under Section 523(a)(2)(A) but allowed the claim under Section 523(a)(2)(B) because the statements were in writing.

Other judicial decisions are similar.  For example, in *Swift Fin./M & I Bank, FSB v. Sass (In re Sass)*, 2010 WL 5475708, at *4 (Bankr. N.D. Ill. Dec. 30, 2010), a debtor applied for a loan from a bank through a telephonic application process.  During one of the calls, the debtor verbally overstated her personal income and obtained the loan on the basis of that lie.  Later, the debtor defaulted on the loan and filed for bankruptcy protection.  The bank sought a determination of nondischargeability under Section 523(a)(2)(A) based upon the verbal misrepresentation about income.  The *Sass* court determined that the misrepresentation about income was a statement about the debtor's financial condition; so it was not actionable under Section 523(a)(2)(A).  Instead, the *Sass* court recognized that "[d]ebts arising from false oral statements respecting financial

condition remain dischargeable." *Id.* at *3; *see also Knoxville TVA Emps. Credit Union v. Sallie (In re Sallie)*, 2009 WL 1917959, at *5 (Bankr. E.D. Tenn. July 1, 2009) ("statements regarding the amount of income earned by an individual are statements respecting financial condition, even under a strict interpretation").

And, written loan applications requiring disclosure of employment and income are almost universally considered statements "respecting the debtor's . . . financial condition" actionable under Section 523(a)(2)(B) alone. *See Kessler v. Longmire (In re Longmire)*, 2019 WL 1458927, at *8 (Bankr. N.D. Cal. Mar. 29, 2019) ("[A]n applicant's income constitutes a statement in writing respecting the applicant's financial condition for purposes of § 523(a)(2)(B)."); *Park Nat'l Bank v. Shilling (In re Shilling)*, 2013 WL 4039417, at *2 (Bankr. N.D. Ohio Aug. 7, 2013) ("The credit application clearly respects the Debtor's financial condition. It contains information on her employment, including her annual income."); *Midwest Comm. Fed. Cr. Union v. Sharp (In re Sharp)*, 357 B.R. 760, 765 (Bankr. N.D. Ohio. 2007) (written statement in loan application regarding monthly income was a statement respecting debtor's financial condition governed by Section 523(a)(2)(B)); *Dalcourt*, 354 B.R. at 874 ("[A] credit application . . . is a statement in writing respecting the debtor's financial condition. It is a statement of [debtor's] ability to generate income."); *Phillips v. Napier (In re Napier)*, 205 B.R. 900, 905 (Bankr. N.D. Ill. 1997) ("The application contained statements about the Debtor's employment, weekly gross earnings, and additional income. Thus, the application constitutes a statement [] concerning the Debtor's financial condition.").

In this Adversary Proceeding, the State's central allegation is that the Debtor stated he was unemployed and had zero income during each of the ten calls to the CUBLine system. The statements were oral. Even if such statements were false (because the Debtor was employed by the School District and K&S and earned income), they simply are not actionable under Section 523(a)(2)(A). [127] Instead, to obtain a

---

[127] In a case bearing some similarities to the facts in this Adversary Proceeding, this Court rejected a legal challenge (under Fed. R. Civ. P. 12(b)(6)) to the sufficiency of the State's complaint. *Colorado v. Wine (In re Wine)*, 558 B.R. 438 (Bankr. Colo. 2016). In *Wine*, the State alleged that the debtor lied to the State about employment and earnings on the CUBLine. The State sought recovery from the debtor of alleged overpaid unemployment benefits along with penalties and collection fees. The State issued a determination which was upheld on appeal. Then, the debtor filed for bankruptcy protection. Thereafter, the State filed an adversary proceeding claiming that the entire debt was nondischargeable under Section 523(a)(2)(A). The debtor "concede[d] that he received overpayments of unemployment compensation and that such overpayments are nondischargeable under Section 523(a)(2)(A)." *Id.* at 440. However, the debtor moved to dismiss with respect to the statutory penalties and collection fees under Section 1328(a)(2) because of the broad provisions governing discharge in Chapter 13 reorganizations. The Court denied the motion to dismiss and ultimately held:

> Based upon a plain reading of Section 523(a)(2)(A) and the CESA [Colorado Employment Security Act, COLO. REV. STAT. § 8-70-101 *et seq.*], and accepting the facts alleged in the Amended Complaint as true, the State adequately alleges a claim for payment against the Debtor for overpaid unemployment compensation, statutory penalties, and collections fees . . . .

*Id.* at 445. So, the Court allowed the State to prosecute its Section 523(a)(2)(A) claim.

nondischargeability determination, such statements must be in writing and prosecuted under Section 523(a)(2)(B).  *Lamar*, 138 S. Ct. at 1764.  And, the State is not pursuing a Section 523(a)(2)(B) claim.

The Court's decision might appear, at first blush, to be hyper-technical.  But it is not.  The Court must follow the text of the Bankruptcy Code as enacted by Congress.  The Court simply has no authorization to depart from the statute and enter a nondischargeability judgment under Section 523(a)(2)(A) for an oral statement "respecting the debtor's financial condition."  "[I]f Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent." *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004).  Meanwhile, it is not the Court's role to announce its preferred result in place of Congress.  *Id.* at 542; *Baker Botts L.L.P. v. Asarco LLC*, 135 S. Ct. 2158, 2169 (2015) (the Supreme Court "lack[s] the authority to rewrite the statute" even if it wishes for a different policy result).

The Court recognizes that the State is endeavoring to fulfill the mandate of the Colorado Employment Security Act, Colo. Rev. Stat. § 8-70-101 *et seq. (the "*CESA"), to provide claimants with prompt payment of unemployment benefits.  Toward that end, it implemented the CUBLine and online claim processing system.  The Court also acknowledges that the State is trying to protect the integrity of the Colorado unemployment benefits system by prosecuting claimants who have lied about their employment and income both inside and outside of the bankruptcy context.  But, when the State pursues nondischargeability claims in the Bankruptcy Court for false statements, the State must provide evidence of a debtor's lies in writing, and then, proceed under Section 523(a)(2)(B).  As the Supreme Court held:

> They [creditors] can still benefit from the protection of § 523(a)(2)(B) so long as they insist that the representations respecting the debtor's financial condition on which they rely in extending money, property, services, or credit are made in

---

Although the *Wine* result may appear, at first blush, somewhat contrary to the Court's decision in this Adversary Proceeding, the Court notes the following distinctions.  First, unlike this Adversary Proceeding, the debtor in *Wine* conceded the propriety of the State's Section 523(a)(2)(A) claim for overpaid unemployment compensation.  Second, the focus of the dispute between the State and the debtor in *Wine* was the dischargeability of penalties and collection fees in Chapter 13.  This Adversary Proceeding involves the discharge in a Chapter 7 liquidation, not in Chapter 13 reorganization.  Third, the procedural posture in the *Wine* case was different.  The issues surfaced through a motion to dismiss under Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012.  In this Adversary Proceeding, the parties presented their evidence at trial.  Finally, the *Wine* decision predated the Supreme Court's *Lamar* decision by almost two years.  In 2016, the Court was obligated to follow binding precedent from the United States Court of Appeals for the Tenth Circuit: *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700 (10th Cir. 2005). In *Joelson*, the Tenth Circuit had adopted a very narrow reading of the "statement respecting the debtor's . . . financial condition" exception in Section 523(a)(2)(A). It held that the phrase "statement respecting a debtor's . . . financial condition" must be construed "strict[ly]" and applies only to information "as to the debtor's or insider's overall net worth or overall income flow".  *Id.* at 714.  In 2018, through the *Lamar* decision, the Supreme Court abrogated the *Joelson* precedent.  Now, this Court is obligated to follow the Supreme Court's decision in *Lamar* and must broadly construe statements respecting a debtor's financial condition.

writing.  Doing so will likely redound to their benefit, as such writings can foster accuracy at the outset of a transaction, reduce the incidence of fraud, and facilitate the more predictable, fair, and efficient resolution of any subsequent dispute.

*Lamar,* 138 S. Ct. at 1764.[128]  Justice Sotomayor's words are especially prescient in relation to this Adversary Proceeding.  Given the nature and poor quality of the evidence presented by State concerning what actually happened when the Debtor was talking "to the computer" through the CUBLine system, forcing the Debtor to make his representations in writing would better "reduce the incidence of fraud" and "facilitate the more predictable, fair, and efficient resolution" of employment benefits nondischargeability disputes.[129]

---

[128]     A footnote from *Lamar* deserves some attention.  In responding to the argument that the petitioner's "construction gives Section 523(a)(2)(B) an implausibly broad reach," the Supreme Court explained that:  "Section 523(a)(2)(A) has been applied when a debt arises from 'forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation.'"  *Lamar*, 138 S. Ct. 1763 (quoting *Husky Int'l Elec., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016)).  After that passage, the Supreme Court added a footnote.  Footnote No. 4 states:

> See also, *e.g., In re Tucker,* 539 B.R. 861, 868 (Bankr. D. Idaho 2015) (holding nondischargeable under § 523(a)(2)(A) a debt arising from the overpayment of social security disability benefits to an individual who failed to report changes to his employment despite a legal duty to do so); *In re Drummond,* 530 B.R. 707, 710, and n. 3 (Bankr. E.D. Ark. 2015) (same, and concluding that "the requirement of the debtor to notify [the Social Security Administration] if she returns to work is not a statement that respects the debtor's financial condition").

*Lamar*, 138 S. Ct. 1763 n.4.  Both the *Tucker* and *Drummond* decisions involved overpayment of government benefits.

     Subsequently, one bankruptcy court relied on the footnote and held that "based on *Lamar*, . . . statements concerning employment status are not statements respecting the debtor's financial condition." *Md. Cent. Collection Unit v. Johnson (In re Johnson)*, 2019 WL 4164860, at *5 (Bankr. D. Md. Aug. 30, 2019).  Respectfully, the Court believes that the *Johnson* holding is incorrect and misapplies the *Tucker, Drummond,* and *Lamar* decisions.  The main point is that neither the *Tucker* nor *Drummond* cases involved any "statement respecting the debtor's . . . financial condition."  Instead, in both cases, the conduct centered on omissions (*i.e.,* debtors had failed to report or notify government agencies concerning changes to employment and income).  *See Tucker*, 539 B.R. at 864 ("Debtor did not advise the SSA of changes in employment or income"); *Drummond*, 530 B.R. at 709 (debtor "fail[ed] to report her work activity").  So, there were no "statements" at all in *Tucker* or *Drummond* — only failures to submit reports.  Because there were no statements, the last clause of Section 523(a)(2)(A) never came into play.  The *Drummond* court clarified as much when it held that "the requirement of the debtor to notify [the Social Security Administration] if she returns to work is not a statement that respects the debtor's financial condition." *Drummond*, 530 B.R. at 710 n.3.  This Adversary Proceeding involves multiple alleged statements regarding employment and income.  So, the *Lamar* precedent mandates dismissal of the State's Section 523(a)(2)(A) claim.

[129]     In the past, before the widespread use of personal computers and interactive voice response systems, claimants were required to submit written forms requesting unemployment benefits from the State.  Although perhaps less technologically advanced, the former system provided more definitive evidence for nondischargeability purposes than an automated telephone system.  Likely there are good policy reasons

2.     __The State Failed to Prove the Alleged Misrepresentations__.

In the Complaint, the State appears to focus on the "false representation" prong of Section 523(a)(2)(A).  For that type of claim, the State must demonstrate the following elements by a preponderance of the evidence:

> (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the false representation resulted in damages to the creditor.

*Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *see also Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782 (10th Cir. 2009).

In this Adversary Proceeding, the State alleged that during each of the Debtor's ten calls to the CUBLine system, the Debtor reported that he was not employed and earned no income.  However, the State's evidence is insufficient to prove what actually happened during the telephone calls to the CUBLine system.  The State did not record any of the calls.  There is no transcript.  No employee of the State can testify accurately about what happened on the calls because the CUBLine system is fully automated.  On the State side, there is no human participation.  Instead, when the Debtor called the CUBLine system, he only was able to talk "to the computer."

The State has provided a script for CUBLine system calls.  The key CUBLine questions in this case are the "Did You Work Question" and the "Earnings and Hours Questions."  However, the State's evidence failed to establish exactly how the Debtor answered the "Did You Work Question."  The Debtor may have answered "No," in which case the call would have mostly been at an end, except for verification.  Or, the Debtor may have answered "Yes," in which case he would have been asked the "Earnings and Hours Questions" as follow-up.  And, then, perhaps the Debtor responded by stating "zero" hours and "zero" earnings.  The Court simply does not know specifically what happened on the CUBLine system calls.  It is true that the State provided a copy of a Payment History.  The Payment History is supposed to "translate" whatever the Debtor stated during the CUBLine system calls.  But the "translation" is only some empty white space on the Payment History.  From this, the State created an Earnings Summary wherein the State contended that the Debtor reported "$0.00" in "Gross Earnings" and "0" for "Hours."  The State, however, did not demonstrate a sufficient linkage between what specifically occurred on the CUBLine system calls and the Payment History and Earnings Summary.  For example, none of the State's documentary evidence purports to identify how exactly the Debtor responded to the "Did You Work Question" and the "Earnings and Hours Questions" (if the "Earnings and Hours Question" was actually posed by the

---

why the State switched to an automated telephone procedure.  The CUBLine system probably is cheaper to operate and facilitates quicker benefits for unemployed claimants.  But, the Court cannot decide this Adversary Proceeding by guessing what policy or procedure is best.  The Court's role is limited to interpreting and applying the text of the bankruptcy nondischargeability statutes.

computer).  No underlying data has been presented.  And, the State did not present any testimony concerning the design and function of the CUBLine system.

Although the Court would have had concerns with the quality of the State's evidence even if it had not been called into question, the Court's concerns are heightened because of the Debtor's flat denial under oath.  The Debtor testified that he honestly and truthfully provided his "hours worked and wages earned" during every CUBLine call between January 1, 2017 and May 27, 2017.  The Court observes that the Debtor's testimony was confused and, sometimes, even contradictory.  Also, the Debtor's credibility is suspect.

But, in the end, the Court does not know what exactly happened on the ten CUBLine system calls.  An accusation of false representation requires something more than what the State has presented.  Thus, the Court determines that the State failed to prove, by a preponderance of the evidence, any false representations made by the Debtor.  Since no false representations have been proved, the Section 523(a)(2)(A) claim fails.[130]

## B.  **The State Partially Established its Section 523(a)(7) Claim.**

In addition to the Section 523(a)(2)(A) cause of action, the State also asserted a nondischargeability claim under Section 523(a)(7).[131]  Section 523(a)(7) provides:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt — . . . (7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss . . . .

Parsing the statute further, there are three distinct elements:  "(1) [T]here must be a debt for a fine, penalty, or forfeiture; (2) [the] debt must be payable to and for the benefit of a governmental unit; and (3) [the] debt cannot constitute compensation for actual pecuniary loss."  *Colo. ex rel. Salazar v. Jensen (In re Jensen)*, 395 B.R. 472, 480 (Bankr. D. Colo. 2008).  So, the statute requires the Court to determine the character of the underlying Debt.

In the Complaint, the State asserted that the Debtor is liable to the State for overpaid unemployment compensation for the period from January 1, 2017 to May 27, 2017 in the amounts of:  (1) $6,252.00 for "unemployment compensation"; (2) $4,063.80 for "a 65% monetary penalty"; and (3) $2,578.95 for "a 25% collection fee."[132]  Thus, the State alleged an aggregate Debt of $12,894.[133]  The Debtor has not contested the dollar

---

[130]    The Debtor also contends that the State failed to demonstrate the Debtor's "intent to deceive." Given the Court's disposition of the Section 523(a)(2)(A) claim in favor of the Debtor on other grounds, the Court need not decide the intent issue.
[131]    Compl. ¶ 17.
[132]    Compl. ¶¶ 5-11 and 16.
[133]    *Id.* ¶¶ 15 and 18.

amount of the Debt and has not contested that he owes such amount to the State.  So, the State has established the validity of the Debt.  Section 523(a)(7) requires the Court to consider the character of each of the components of the Debt.

### 1.   The Overpaid Unemployment Benefits Are Dischargeable.

The first component of the Debt owed to the State is $6,252.00 for "unemployment compensation."[134]  The State also has referred to such amount as "Benefits Overpaid" and "Overpaid Amount."  The underlying State statutory basis for the claim is the CESA.

The CESA provides for "the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."  COLO. REV. STAT. § 8-70-102.  In general terms, Colorado employers must pay premiums to an unemployment compensation fund administered by the State.  COLO. REV. STAT. §§ 8-76-101 to 8-79-108.  Eligible unemployed persons may request payment of benefits from the unemployment compensation fund.  COLO. REV. STAT. §§ 8-73-101 to 8-74-109.  Eligibility and benefits amounts are determined weekly, but benefits are paid bi-monthly.  COLO. REV. STAT. § 8-73-101.  It is fair to say that eligibility and benefits determinations involve a complex process requiring the application of a myriad of statutes and regulations.  In any event, as set forth above, the Debtor requested unemployment benefits and received payments of $11,928.00 during the period from January 1, 2017 to May 27, 2017.

Subsequently, the State determined that it overpaid the Debtor by $6,252.00 since it had not taken into account the Debtor's employment and earnings from the School District and K&S during the period.  The amount of overpayment was calculated by the State's computer system based upon the Earnings Summary.  Overpayments are not uncommon in the unemployment benefits system.  But, the CESA provides a mechanism for recovery of overpaid unemployment benefits.  COLO. REV. STAT. § 8-74-109(2) states:

> If by reason of fraud, mistake, or clerical error a claimant
> receives moneys in excess of benefits to which he is entitled
> . . . , the division shall recoup such moneys . . . .

See also COLO. REV. STAT. § 8-79-102 (governing the collection of overpaid unemployment benefits).

The $6,252.00 in overpaid unemployment benefits sought by the State is an attempt to "recoup such moneys."  Even the Debtor acknowledges that he owes the State that amount.  However, nondischargeability under Section 523(a)(7) is limited to debt "for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit."  The "fine, penalty, or forfeiture" "may be either criminal or civil in nature."  Jensen, 395 B.R. at 480.  Further, Section 523(a)(7) nondischargeability is not available for "compensation for actual pecuniary loss."

---

[134]       Id. ¶¶ 14-15.

The State cannot use Section 523(a)(7) to obtain a determination of nondischargeability for the $6,252.00 in overpaid unemployment benefits because such amount is "compensation for actual pecuniary loss." In other words, the State suffered pecuniary loss when it paid the Debtor even though the Debtor was not entitled to the $6,252.00 in unemployment benefits. The State seeks repayment and its attempt to recover such amount is an attempt to obtain compensation for the loss. *See* Colo. Rev. Stat. § 8-81-101(4)(a)(I) ("Any person who has received any sum as benefits . . . to which he is not entitled shall be required to repay such amount to the division for the fund.").

Furthermore, Section 523(a)(7) nondischargeability also is not available because the $6,252.00 in overpaid unemployment benefits is not a "fine, penalty, or forfeiture." Again, it is only an actual pecuniary loss that bears none of the hallmarks required for penal recovery. Further, the State failed to identify any legal sources suggesting that such amount is a "fine, penalty, or forfeiture."

### 2.   The 65% Monetary Penalty Is Nondischargeable.

The second component of the Debt owed to the State is $4,063.80 which the State characterizes as a "65% monetary penalty."[135] Mathematically, the $4,063.80 is indeed 65% of the $6,252.00 in overpaid unemployment benefits. The State relies on Colo. Rev. Stat. § 8-81-101(4)(a)(II) as the statutory basis for the imposition of such penalty. That statute states:

> If any person receives an overpayment because of his or her false representation or willful failure to disclose a material fact . . . the person shall pay to the division [the State] the total amount of the overpayment plus a sixty-five percent monetary penalty.

To determine whether the "65% monetary penalty" is nondischargeable under Section 523(a)(7), the Court must first decide whether it is a "fine, penalty, or forfeiture." Although that inquiry is a matter of federal bankruptcy law, the Court "looks to State law to determine whether the debt at issue possesses these attributes . . . .", especially if the debt arises under State law. *Jensen*, 395 B.R. at 481.

The relevant State statute, Colo. Rev. Stat. § 8-81-101(4)(a)(II), expressly uses the term "monetary penalty." And, the Court must give fealty to the text of the statute when determining meaning. *See Ransom v. FIA Card Servs., N.A.,* 562 U.S. 61, 69 (2011) (the inquiry must begin with "the language of the statute itself."); *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (same); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.") So, the text of the statute supports the characterization of the "65% monetary penalty" as a true "penalty."

---

[135]      *Id.* ¶ 15.

The statutory structure also supports that conclusion.  COLO. REV. STAT. § 8-81-101(4)(a)(II) is located within Title 8, Article 81 which bears the general heading: "Penalties and Enforcement."  And the specific statute is titled:  "Penalties."  Although headings and titles should never override statutory text, they "are permissible indicators of meaning."  ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 221 (2012).

Delving into the substance, COLO. REV. STAT. § 8-81-101(4)(a)(II) provides for recovery of a "monetary penalty" that is calculated as a percentage of the actual pecuniary loss (*i.e.*, the overpaid unemployment benefits).  The nature of such calculation is indicative of a penalty. *Gerald H. Phipps, Inc. v. Travelers Prop. Cas. Co. of Amer.*, 2015 WL 5047640 (D. Colo. Aug. 27, 2015) (remedy of "two times the covered benefit . . . reflects the imposition of a penalty rather than compensation for actual damages."); *Jensen*, 395 B.R. at 482 ("The penal nature is also reflected in the structure . . . insofar as the statute calculates the amount of the penalty based on the number of [violations].")  Finally, case law construing the imposition of penalties under COLO. REV. STAT. § 8-81-101(4)(a)(II) confirms that the statute "is punitive in nature" and "serves primarily to punish the unlawful act of failing to disclose material information regarding eligibility for unemployment benefits."  *In re Towler*, 493 B.R. 239, 243 (Bankr. D. Colo. 2013).

Adding it all together, and in the absence of any contrary argument by the Debtor, the Court finds that the "65% monetary penalty" is in fact a "penalty" within the meaning of Section 523(a)(7).  With respect to the other elements of Section 523(a)(7), the Court also finds that the penalty is "payable to and for the benefit of a governmental unit" and does not "constitute compensation for actual pecuniary loss."  Thus, the State has proved all the affirmative elements of a nondischargeability claim under Section 523(a)(7) for the $4,063.80 "monetary penalty."

Nevertheless, the Court notes a seeming anomaly.  Is it possible that the underlying pecuniary loss (*i.e.,* the $6,252.00 of overpaid unemployment benefits) is dischargeable whilst the penalty based on a percentage of such loss is nondischargeable under Section 523(a)(7)?  It would seem like a strange result.  However, the Court does not decide cases in a results-driven fashion.  Instead, the Court follows the applicable statutes and law.  And, Section 523(a)(7) has no requirement that the underlying pecuniary loss must be nondischargeable in order for the associated penalty to also be nondischargeable.  Congress could have easily added that requirement but did not do so.

One recent appellate decision substantively and squarely addresses this unusual topic.  *Ind. ex rel. Ind. Dep't of Workforce Dev. v. Brown*, 2019 WL 1746279 (N.D. Ind. Apr. 17, 2019).  In that case, the governmental agency asserted two nondischargeability claims against a debtor: (1) a Section 523(a)(2)(A) claim for pecuniary loss (*i.e.,* alleged overpaid unemployment benefits of $30,752.00); and (2) a Section 523(a)(7) claim for civil penalties of $17,765.00.  The bankruptcy court denied the Section 523(a)(2)(A) claim.  Then, without any legal analysis, it decided that "a debt for a penalty is automatically discharged if the underlying debt is also discharged."  *Id.* at *3.  The governmental unit appealed only the nondischargeability ruling for the civil penalties.  On appeal, the district

court framed the question as whether "the dischargeability of a penalty depends on the status of the underlying debt." *Id.* The appellate court answered the question this way:

> Nothing in the statute [Section 523(a)(7)] says that a penalty is automatically discharged if a related underlying debt is discharged. Section 523(a)(7) identifies three elements that, when met, make a debt non-dischargeable, and those elements do not refer to the status of an underlying debt. In addition, § 523(a)(7) often applies to penalties imposed on criminal convictions, where there is no underlying debt at all.

*Id.* Thus, the district court reversed the bankruptcy court and determined that a civil penalty may be nondischargeable under Section 523(a)(7) even if the underlying debt is dischargeable. *See also Ind. ex rel. Ind. Dep't of Workforce Dev. v. Holmes (In re Holmes)*, 2018 WL 4719097, at *6 (Bankr. S.D. Ind. Sept. 28, 2018) (holding, without analysis, that the penalty portion of a debt was nondischargeable even though underlying overpaid unemployment benefits portion of debt was dischargeable).

The Court concurs with the analysis and result in the *Brown* decision even though it may seem strange. Under Section 523(a)(7), penalties may be nondischargeable even if there is no other underlying nondischargeable debt. *See e.g. Kelly v. Robinson*, 479 U.S. 36 (1986) (restitution obligations imposed on a criminal defendant are nondischargeable as "a fine, penalty, or forfeiture" under Section 523(a)(7)). Thus, even though the $6,252.00 in overpaid unemployment benefits in this Adversary Proceeding is dischargeable under Section 523(a)(7), the $4,063.80 "monetary penalty" is not dischargeable.

### 3.    The 25% Collection Fee Is Dischargeable.

The third and final component of the Debt owed to the State is the $2,578.95 which the State characterized as a "25% collection fee."[136]  Mathematically, the $2,578.95 is 25% of the aggregate of the $6,252.00 in overpaid unemployment benefits plus the $4,063.80 monetary penalty expressed as follows: ($6,252.00 + $4,063.80) X .25 = $2,578.95. The State justifies the imposition of a 25% collection fee by referencing COLO. REV. STAT. § 8-79-102. However, that statute does not expressly provide for a 25% collection fee. Instead, COLO. REV. STAT. § 8-79-102(2) states only:

> If the division [the State] determines an account to be uncollectible, such account may be referred to the controller for collection. Reasonable fees for collection, as determined by the director of the division and the controller, shall be added to the amount of the debt. The debtor shall be liable for repayment of the total amount outstanding plus the collection fee.

---

[136]    Compl. ¶ 15.

The State has not provided the Court with legal authority specifying the imposition of a 25% collection fee.  The statute only speaks to "reasonable fees for collection;" but, the State has not introduced any evidence to establish whether the imposition of a 25% collection fee is "reasonable."  Moreover, the State has not established that the proposed percentage collection fee should be calculated based upon the total of the actual pecuniary loss plus the 65% monetary penalty.

Regardless, for purposes of nondischargeability analysis under Section 523(a)(7), the Court assumes that the 25% collection fee is valid and properly assessed.  But, to be nondischargeable, the State must meet its burden to prove that the collection fee is "a fine, penalty, or forfeiture" that is "payable to and for the benefit of a governmental unit" and does not "constitute compensation for actual pecuniary loss."  One part of the equation is easy.  The collection fee is payable to the State.  But the other requirements ("a fine, penalty, or forfeiture" that does not "constitute compensation for actual pecuniary loss") are not so clear.

The State has not provided the Court with any legal authority suggesting that the collection fee is "a  fine, penalty, or forfeiture."  So, the Court is left to its own devices.  Again, the Court starts with the statutory text.  *Ransom,* 562 U.S. at 68; *Ron Pair Enter.*, 489 U.S. at 241.  The CESA makes a distinction between "penalties" and "collection fees."  For example, as already discussed, COLO. REV. STAT. § 8-81-101(4)(a)(II) provides for a "sixty-five percent monetary penalty."  But, the "reasonable fees for collection" in COLO. REV. STAT. § 8-79-102(2) is something else.  Since the Colorado Legislature knew how to identify penalties in the CESA, it only stands to reason (by negative implication) that collection fees are not penalties.  The structure of the CESA also supports this conclusion.  The CESA contains an entire article (Article 81) governing "Penalties and Enforcement."  The enumerated penalties include: various criminal penalties (such as fines and imprisonment); ineligibility to receive future unemployment benefits; and account charges.  COLO. REV. STAT. § 8-81-101.  The list of penalties is extensive and comprehensive.  The collection fee is not amongst them.  Thus, the structure of the CESA indicates that the collection fee is not "a fine, penalty, or forfeiture."

The manner in which the collection fee is assessed also suggests that it is not a penalty.  As already discussed, the CESA provides that if the State "determines an account to be uncollectible, such account may be referred to the controller for collection." COLO. REV. STAT. § 8-79-102(2).  Then, once referred for collection, "reasonable fees for collection" may be added to the amount of the debt.  *Id.*  So, unlike most penalties, the amount of the collection fee is not statutorily set based on a fixed amount, multiple, or percentage of the underlying debt or number of violations.[137]  *Compare Gerald H. Phipps*, 2015 WL 5047650 (remedy of "two times the covered benefit . . . reflects the imposition of a penalty rather than compensation for actual damages."), *and Jensen*, 395 B.R. at 482 ("The penal nature is also reflected in the structure . . . insofar as the statute calculates the amount of the penalty based on the number of [violations].")  The requirement that the collection fee be "reasonable" also suggests that the collection fee is not a penalty.

---

[137]    The Court observes that the State set a 25% collection fee in relation to the Debtor.  But, that is not mandated by statute.  And, the Court has received no evidence concerning the derivation of the percentage utilized by the State.

Instead, the term "reasonable" raises the question: reasonable in comparison to what? Put another way, "reasonable" also implies some sort of analysis measuring the amount of the proposed collection fee against something else: for example, the amount of the overpaid unemployment benefits and the amount of time and effort required for the State to collect the overpaid benefits. The requirement for additional reasoned analysis cuts against the collection fee's being considered a penalty. Further, the phrase "collection fee" itself suggests that the fee is being imposed to compensate the State for the expenses of collection, including attorney's fees and costs. Again, that is not indicative of a penalty.

Stepping away from the statutory text and structure, the State has not directed the Court to any legal authority suggesting that the collection fee under the CESA is a non-compensatory "fine, penalty, or forfeiture." The Court's own research reveals a mixed bag at both the federal and state levels. The *Jensen* decision is somewhat analogous. *Jensen*, 395 B.R. 472. One of the issues presented in *Jensen* was whether attorney's fees awarded under the Colorado Consumer Protection Act ("CCPA") (Colo. Rev. Stat. § 6-1-101 *et seq.*) and the Colorado Credit Services Organization Act (Colo. Rev. Stat. § 12-14.5-101 *et seq.*[138]) were nondischargeable under Section 523(a)(7). The bankruptcy court relied on Colorado Supreme Court precedent which held that "[t]he availability of attorney fees serves the CCPA's punitive and deterrent purposes." *Id.* at 487 (quoting *Hall v. Walter*, 969 P.2d 224, 231 (Colo. 1998)). Based on that holding, the bankruptcy court ruled: "Although it is a close call, this Court concludes that the award of fees and costs in this case is sufficiently penal so that it amounts to a 'fine, penalty, or forfeiture' . . . . and is nondischargeable under Section 523(a)(7)." *Id.* at 487-88. The *Jensen* result was later endorsed by the Colorado Court of Appeals in another CCPA case. *Colo. ex rel. Coffman v. Robert J. Hopp & Assoc., LLC*, 422 P.3d 617, 622 (Colo. App. 2018). While the *Jensen* and *Hopp* decisions are analogous, they are also distinguishable from this Adversary Proceeding in at least two important respects. First, both decisions relied on Colorado Supreme Court precedent interpreting the attorney's fees provisions of the CCPA; but there is no such Colorado precedent construing the CESA. Second, the text and structure of the CCPA and the CESA are entirely different.

Other recent Colorado precedent seems to point a different direction. Part of the dispute in *Guarantee Tr. Life Ins. Co. v. Estate of Casper*, 418 P.3d 1163 (Colo. 2018) was the characterization of attorney's fees and costs under a Colorado statute governing unreasonable delay or denial of insurance benefits. The appellate court decided that "the text and structure of the statutory scheme" dictated that "the legislature did not intend the [the attorney's fee statute] to operate as a penal statute." *Id.* at 1171-72. The Colorado Supreme Court issued a similar decision the same day: *Rooftop Restoration, Inc. v. Am. Family Mut. Ins. Co.*, 418 P.3d 1173 (Colo. 2018). In *Rooftop Restoration*, the appellate court again emphasized the primacy of statutory interpretation and observed that a penalty "is usually in the form of imprisonment or fine." *Id.* at 1177. The collection fee in this case is not imprisonment or a fine.

---

[138]    As of August 9, 2017, approximately nine years after the *Jensen* decision issued, Colo. Rev. Stat. § 12-14.5-101 *et seq.* was relocated to Colo. Rev. Stat. § 5-19-101 *et seq.*

Recognizing that some statutory schemes are harder to decipher than others, the Colorado Supreme Court suggested that courts evaluating whether a statute is penal could resort to using the test articulated in an earlier decision, *Kruse v. McKenna*, 178 P.3d 1198 (Colo. 2008), if "the intent of the legislature is not clear from the plain meaning of the relevant statutory text when viewed in the context of the statutory scheme as a whole." *Rooftop Restoration*, 418 P.3d at 1176.

In *Kruse*, the Colorado Supreme Court "distilled a three part-test to determine whether a statute is penal . . . ." *Id.* at 1175. Under the *Kruse* test, a statute is deemed penal if: (1) the statute asserted a new and distinct cause of action; (2) the claim would allow recovery without proof of actual damages; and (3) the claim would allow an award in excess of actual damages. *Kruse*, 178 P.3d at 1201.

Even assuming that the statutory text and structure of the CESA were unclear concerning the characterization of the collection fee, application of the *Kruse* test would still confirm that the collection fee is not penal. The most salient element is whether the claim would allow recovery without proof of actual damages. The Court determines that for an overpaid unemployment benefits claim under the CESA, the State must establish an overpayment (*i.e.,* actual damages). COLO. REV. STAT. § 8-81-101(4)(a)(II). Further, the monetary penalty can only be assessed as 65% of the "total amount of the overpayment." COLO. REV. STAT. § 8-81-101(4)(a)(II). If there is no overpayment and no monetary penalty, then there is nothing for the State to collect through the collection fee under COLO. REV. STAT. § 8-79-102(2). And, any attempt to collect would not be "reasonable." *Id.* So, Colorado precedent construing the CESA dictates that the collection fee under the CESA is not "a fine, penalty, or forfeiture."

In the final analysis, the Court determines that the State did not meet its burden to prove that the 25% collection fee is "a fine, penalty, or forfeiture." Further, the State failed to establish that the 25% collection fee "is not compensation for actual pecuniary loss." Accordingly, the States' Section 523(a)(7) nondischargeability claim for the collection fee fails. The 25% collection fee component of the Debt is dischargeable.

## VII.   Conclusion and Order.

The Court appreciates the important but difficult role that the State plays in ensuring a functioning unemployment compensation system for the people of the State of Colorado. Scofflaws must be discouraged for the system to work. And, maybe the Debtor was a scofflaw — it is all a bit unclear. Given the poor nature and quality of the evidence, it is almost impossible for the Court to ascertain what really happened in the CUBLine netherworld. But even accepting the State's allegations that the Debtor made false statements concerning his employment and income, such false statements simply are not an actionable basis for nondischargeability under Section 523(a)(2)(A). With respect to its claim for nondischargeability under Section 523(a)(7), the State fares slightly better. The 65% monetary penalty (totaling $4,063.80) sought by the State is nondischargeable since it is "a fine, penalty, or forfeiture" under Section 523(a)(7). But all the other components of the State's Debt fail the statutory test.

Accordingly, the Court:

ORDERS that Judgment shall enter in favor of the Debtor and against the State on the First Claim for Relief under Section 523(a)(2)(A); and

FURTHER ORDERS that Judgment shall enter in favor of the State and against the Debtor on the Second Claim for Relief under Section 523(a)(7) but only to the extent of the monetary penalty of $4,063.80.  In all other respects, Judgment shall enter in favor of the Debtor and against the State.

DATED this 1st day of November, 2019.

BY THE COURT:

_Thomas B. McNamara_

Thomas B. McNamara,
United States Bankruptcy Judge